UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BERTEK SYSTEMS, INC.,          :
                               :   NO. 1:04-CV-00700
          Plaintiff,           :
                               :   **OPINION AND ORDER**
                               :
    v.                         :
                               :
                               :
LEXMARK INTERNATIONAL INC.,    :
                               :
          Defendant.           :

This matter is before the Court on the Motion for Summary
Judgment by Defendant Lexmark International, Inc. (hereinafter
"Lexmark) (doc. 23), the Plaintiff Bertek Systems, Inc.'s
(hereinafter "Bertek") Memorandum in Opposition to Defendant's
Motion for Summary Judgment (doc. 26), and Lexmark's Reply
Memorandum in Support of its Motion for Summary Judgment (doc. 27).
For the following reasons the Court GRANTS Lexmark's Motion.

**FACTS**

The following facts are taken from Lexmark's Motion for
Summary Judgment. Those facts disputed or otherwise highlighted by
Bertek in its Response are also discussed. Lexmark is a
manufacturer of laser printers (doc. 23). Bertek is a manufacturer
of labels that can be affixed to vials containing pharmaceutical
drugs (<u>Id</u>.). Lexmark printers are used by various pharmacies
across the United States to print on labels such as those produced

by Bertek (Id.).  Pharmacies historically used "simplex" labels (i.e., labels printed on only one side) (Id.).  In the mid-1990's Lexmark decided to test simplex labels from various manufacturers and identify those labels which were compatible with its printers (Id.).  Lexmark asserts that it did so as a courtesy and service to its customers (Id.).  Lexmark developed criteria to assist in determining which labels were compatible with its printers (Id.).  Ultimately a list was created which identified those label manufacturers whose labels met the criteria (the "Converter List") (Id.).[1]  Bertek's simplex labels were included on the Converter List and remain so to this very day (Id.).

In the late 1990's, companies began developing "duplex" labels (i.e., forms/labels which can be printed on both sides) (Id.).  Lexmark again developed criteria for testing duplex labels for compatibility with its printers (Id.).  A "Duplex Converter List" was established (Id.).  Lexmark avers that at all times it made clear to label manufacturers that it was under no duty to test any specific label (Id.).  Furthermore, Lexmark reportedly notified label manufacturers that they could be removed from the Converter Lists if Lexmark received complaints from its customers about a

---

[1] The term "converter" was used because the label manufacturer uses pressure sensitive materials, combines them with other papers and glue, and "converts" the various elements into a label that can be affixed to a prescription vial (doc. 23).  For purposes of this Order, the Court may sometimes refer to Bertek as a manufacturer and at other times as a converter.

particular manufacturer's labels (<u>Id</u>.).

Walgreens utilizes Lexmark printers in approximately 4,700 of its pharmacies across the United States and was one of the first large, national pharmacies to employ duplex labels (<u>Id</u>.). The majority of Walgreens pharmacies use three to four Lexmark printers (<u>Id</u>.). Walgreens was already using duplex labels from two different converters, Standard Register and NCR, at the time that Bertek initiated development of its own duplex label (<u>Id</u>.). Walgreens requested that Lexmark perform testing on the Bertek duplex labels (<u>Id</u>.). Lexmark did the testing per Walgreens' request (<u>Id</u>.). Bertek did not pay for this testing (<u>Id</u>.).

In July 2000, Lexmark performed testing on the Bertek duplex labels (<u>Id</u>.). Mr. Neal Barnes (hereinafter "Barnes"), a mechanical engineer who had worked for Lexmark (and its predecessor, IBM) for twenty-six years, directed the testing of any converter label for inclusion on one of the Converter Lists (<u>Id</u>.). Barnes had the responsibility of evaluating the results of the tests to determine whether a particular label met the criteria for addition to a Converter List (<u>Id</u>.). Lexmark maintained a laboratory specifically for this type of testing (<u>Id</u>.). Lexmark maintains that Barnes performed this testing from a purely scientific perspective with no predisposition to pass or fail any potential converter's labels (<u>Id</u>.). It was in Lexmark's best

3

interests to ensure that the testing performed was accurate and thorough as Lexmark's credibility would be diminished if it recommended a label that was incompatible with one of its printers (Id.).

Furthermore, Barnes considered it advantageous for Lexmark to include, rather than exclude, any label that met its criteria for compatibility with its printers (Id.). Bertek acknowledges that it has no objective evidence that Barnes intended for Bertek's labels to fail testing (Id.). Bertek's duplex labels did in fact fail the July 2000 testing (Id.).

In November of 2000, Bertek created a new duplex label (Id.). The new duplex labels also failed to meet Lexmark's criteria for suitability (Id.). Consequently, Lexmark refurbished at its own expense three Lexmark printers which Bertek owned and used for its own internal testing of labels (Id.). Bertek admits that Lexmark took steps at its own expense to help it achieve a passing score on the test, thus earning a spot on the Duplex Converter List (Id.).

Bertek's duplex labels again failed Lexmark testing in December 2001 (Id.). In February 2002, Walgreens began testing Bertek duplex labels as well by using some of them in its pharmacies (Id.). Walgreens did this despite the absence of Bertek duplex labels from the Duplex Converter List (Id.). Barnes was

4

aware that Walgreens was using the Bertek duplex labels even though they had not passed testing (Id.).  Lexmark acknowledges that Walgreens could use any label it wanted (Id.).  In May 2002, Walgreens entered into a contract with Bertek in which Bertek agreed to supply Walgreens with duplex labels (Id.).  When this contract was entered into, Bertek's duplex labels were still not on the Converter Duplex List (Id.).  The contract provided for termination if Bertek did not "work towards the obtaining of certification for Lexmark Converter List, duplex section by April 30, 2003" (Id.).  However, Walgreens was not required to terminate the contract if Bertek's duplex labels did not meet the required criteria of the Duplex Converter List by April 30, 2003 (Id.).

Lexmark claims it did not have knowledge of the terms and conditions of this contract (Id.).  Ten days after this contract was made, Barnes began testing the Bertek duplex label again (Id.).  This time the labels passed the first phase of the testing (Id.).  Ultimately, however, the labels did not pass (Id.).  In January 2003, Walgreens became dissatisfied with Bertek's duplex labels (Id.).  Bertek continued to try to improve its duplex labels (Id.).  However, Bertek was not successful in doing so and in May 2003 Walgreens terminated its contract with Bertek pursuant to the above noted clause (Id.).  Walgreens switched to Standard Register labels in those locations where it had been using Bertek duplex labels and

the problems that were occurring ceased (Id.). Walgreens testified in deposition testimony that no one from Lexmark suggested or pressured it to terminate the contract with Bertek (Id.).

Bertek's duplex labels never passed the test for placement in the Duplex Converter List (Id.). There were other converters whose labels also did not qualify to be included in the list (Id.). In fact four of nine label manufacturers who attempted to test onto the list failed and never made the list (Id.). Some labels that were initially admitted on the list later were removed due to customer complaints or other issues (Id.).

Bertek maintains that Lexmark does not provide a "fair and accurate summary of the salient facts" (doc. 26). Bertek highlights that Lexmark dominates the sale of laser printers and toner to retail pharmacies (noting that forty-nine out of the fifty largest retail pharmacy chains in the United States use Lexmark printers and toner) (Id.). Bertek submits that the duplex label industry is a high volume and highly competitive market and that pharmacy chains typically order millions of labels every month (Id.). However, Bertek maintains that essentially no competition exists in the pharmacy laser printer market with Lexmark being the clear and dominant player (Id.).

Bertek submits that the testing to place a label on one of the "Converter Lists" should more accurately be described as a

certification process and that, indeed, employees of Lexmark so classify the process (Id.).  Once a label makes its way onto a one of the Converter Lists, Lexmark does not retroactively test the label (Id.).  So, were a converter to change its label or if new criteria were added to the list, the label would not be re-tested to insure compliance with the listing criteria (Id.).  Bertek notes that changes to the criteria in the list can be made at Lexmark's discretion (Id.).  As such Bertek views gaining acceptance on the Converter List similarly to hitting a moving target - not impossible but difficult given the evolving and fluid nature of the Converter List criteria, changes made to Lexmark printers, and the subjective nature of the entire "certification" process" (Id.).  Bertek claims that it was met with "inexplicable resistance" from Lexmark each time it attempted to gain entry onto the Duplex Converter List (Id.).

In response to several failed attempts to gain acceptance on the Duplex Converter List, Bertek hired an expert, Dr. Ludwig Weimann, who opined that the reason for the Bertek duplex labels' failure was different than that expressed by Lexmark (Id.).  However, despite Dr. Weimann's conclusion, Lexmark stood by its earlier reasoning for the failure (Id.).  Consequently, Bertek continued its attempts to gain Duplex Converter List acceptance (Id.).

7

During the time that Bertek was attempting to achieve acceptance onto the Duplex Converter List, Bertek was involved in negotiations with Walgreens to secure Walgreens' duplex label business (Id.). As noted above, an agreement was reached wherein Bertek agreed to supply Walgreens with duplex labels at specific Walgreens facilities (Id.). Not long after entering into this agreement, Walgreens suffered problems printing the Bertek duplex labels (Id.). Bertek avers that the problems were caused by faulty Lexmark equipment, not its labels as Lexmark alleges (Id.). According to Bertek, Lexmark communicated its conclusion to Walgreens concerning the failure of Bertek's duplex labels (Id.). Consequently, Bertek again retained the services of Dr. Weimann (Id.). Dr. Weimann opined that Lexmark had no scientific basis to lay the blame on the Bertek label (Id.). Additionally, Avery Dennison (the company who provided Bertek with the label stock from which Bertek produced its labels) concluded that Lexmark's explanation for the label problem was incorrect (Id.).

Although these facts as recited by Bertek differ from those proffered by Lexmark, the significant difference in the facts lies in Bertek's assertion that Lexmark refused to "certify" Bertek's labels because it feared Bertek would establish a relationship with Kyocera, a potential competitor to Lexmark in the pharmacy printing/toner business (Id.). Bertek reaches this

8

conclusion based upon observations made by a Lexmark representative Jeff Beard (hereinafter "Beard") (Id.). Beard reportedly witnessed Kyocera at a trade show in San Diego, California handing out sample duplex labels that contained the Walgreens logo; labels that had been printed on a Kyocera printer using Bertek duplex labels (Id.). Furthermore, Beard testified in deposition that he heard of a similar incident which occurred later in time (Id.).

In further support of this assertion, Bertek highlights an email sent from Mark Mellinger (hereinafter "Mellinger"), Beard's direct boss (Id.). The email was also sent to Harry Willard, Mellinger's direct boss and Vice-President of Sales, Retail, and Manufacturing for Lexmark (Id.). Bertek argues that this email "let the cat out of the bag" and clearly indicates Lexmark's tortious interference with Bertek's business relationships (Id.). The portion of the email relied upon by Bertek states:

> Given the poor performance of Bertek labels in 7 previous tests . . . the fact that little or no progress has been made by Bertek between tests . . . choose not to retest their label. (Bob Patton has given us this latitude). Jeff [Beard], Neal [Barnes], and Mike [Huellemeier] seem to leaning [sic] towards this option due to resource bandwidth in addition to the concern that the more we help Bertek overcome their deficiencies the more likely they become a threat should they partner with ELT/Kyocera.

(Id.). Bertek further highlights Barnes' testimony post receipt of

this email in which he testified that the email was forwarded to other Lexmark employees and that Lexmark personnel openly discussed their concern of an Bertek/Kyocera threat (Id.). Bertek maintains that this email coupled with Barnes' testimony is relevant for three reasons: (1) they demonstrate Lexmark's dominance in the retail pharmacy laser printer market; (2) they show who Lexmark perceived as being potential threats to that dominance; and (3) they reveal the real reason Lexmark would not certify Bertek's duplex labels (Id.).

Ultimately Bertek reports that its failure to achieve Duplex Converter List status resulted in a loss of numerous business opportunities (Id.). The importance of gaining entry onto the Duplex Converter list can not be discounted, argues Bertek (Id.). Failure to achieve certification, it argues, effectively prevents a company from supplying duplex labels to the retail pharmacy market (Id.). Bertek avers that Lexmark was well aware of the significance of obtaining entry onto the Duplex Converter List and that a converter's failure to do so would result in that converter being "frozen out of the duplex pharmacy label market" (Id.).

Bertek filed an Amended Complaint on November 5, 2004 (doc. 6). In that Complaint, Bertek asserts two claims (Id.). First, Bertek asserts that Lexmark tortiously interfered with its

10

business relationship with Walgreens (<u>Id</u>.). Count Two of the Complaint alleges that Lexmark violated Ohio's Deceptive Trade Practices Act, Ohio Revised Code Section 4165 <u>et</u> <u>seq.</u> (<u>Id</u>.). Bertek claims that the damages sustained by it because of Lexmark's conduct exceeds $10,000,000.00 (<u>Id</u>.). Lexmark responded to the Complaint denying the claims contained in the Complaint (doc. 7). Ultimately, on September 16, 2005, Lexmark filed its Motion for Summary Judgment (doc. 23) which is at issue in this Order.

**APPLICABLE LEGAL STANDARD**

The narrow question that this Court must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. <u>Id</u>. at 321; <u>Guarino v.</u>

11

Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Guarino, 980 F.2d at 405.

As the Supreme Court stated in Celotex, the non-moving party must "designate" specific facts showing there is a genuine issue for trial. Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, "'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.'" Guarino, 980 F.2d at 405 (quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990). Furthermore, the fact that the non-moving party fails to respond does not lessen the burden on the moving party or the court to demonstrate that summary

12

judgment is appropriate.  <u>Guarino</u>, 980 F.2d at 410; <u>Carver v. Bunch</u>, 946 F.2d 451, 454-55 (6th Cir. 1991).

**ANALYSIS**

**A.  Tortious Interference with a Business Relationship**

Tortious interference with a business relationship occurs when "a person, without privilege to do so, induces or otherwise causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." <u>Bickley v. FMC Tech. Inc.</u>, 282 F. Supp. 2d 631, 643 (N.D. Ohio 2003).  To maintain this action, a plaintiff must establish four elements.  These are:

    1.  A business relationship must exist;

    2.  The wrongdoer must have knowledge of that business relationship;

    3.  The wrongdoer must intentionally, with malice, cause a breach or termination in the business relationship; and

    4.  Damages must result therefrom.

<u>Id</u>.  The record is clear that Bertek had a business relationship with Walgreens of which Lexmark was aware.  As such, the first two elements are established.  Essentially, element four is also satisfied as it does not appear that Lexmark disputes that Bertek suffered damages as a result of its terminated business relationship with Walgreens.  What is disputed, however, is whether Lexmark intentionally caused the breach or termination in the

13

business relationship of Bertek and Walgreens, resulting in damages. Unsurprisingly, Bertek claims that Lexmark did and Lexmark claims it did not.

Lexmark notes that Barnes was the individual at Lexmark conducting tests to determine whether a label made it onto the Duplex Converter List, not anyone else (doc. 23). Furthermore, according to Lexmark, Barnes did not have knowledge of the terms and conditions of the contract between Bertek and Walgreens - specifically, Barnes did not have knowledge that Walgreens might discontinue using Bertek labels if the labels remained unlisted (Id.). As Barnes was the person in charge of conducting the tests and determining whether a label would be listed, any intent to cause interference would, according to Lexmark, reside solely with Barnes (Id.). Additionally, Lexmark submits that absolutely no evidence exists in the record to establish that Barnes performed any act with an intent of causing Walgreens to discontinue using Bertek duplex labels (Id.).

Bertek disputes Lexmark's claim that it was Barnes and Barnes alone who would have made the determination to pass or not pass a particular label (doc. 26). Bertek highlights that Barnes testified that he often consulted with other Lexmark personnel in making that determination (e.g., Beard and Louann Samuels) (Id.). Bertek notes that on one occasion Beard decided to overrule Barne's

14

decision not to re-test Bertek labels (Id.).

Lexmark notes and Bertek agrees that in addition to acting intentionally, a defendant, under Ohio law, must also act with malice when committing the tort of tortious interference with a business relationship (doc. 23 citing Tripp v. Beverly Enters. - Ohio, Inc., 2003 WL 22956442 (Ohio App. Dec. 17, 2003)). Lexmark argues that even if Bertek were to establish that Barnes' testing methods were inadequate or poorly performed (i.e., that he acted merely with negligence), negligence does not equal malice (doc. 23 citing A&B - Abell Elevator Co. v. Columbus Cent. Ohio Bldg. & Constr., 651 N.E. 2d 1283, 1293 (Ohio 1995)). Additionally, Lexmark argues that no testimony or evidence exists that Walgreens would have stopped using Bertek labels if, in its own experience in its own pharmacies, Walgreens had been happy with the label's performance (doc. 23). In other words, Walgreens might have continued using Bertek labels even if they never made it onto the Duplex Converter List (Id.).

Bertek responds arguing that a genuine issue of material fact exists as to whether Lexmark acted with malice in denying Bertek's duplex labels entry onto the Duplex Converter List (doc. 26). Bertek submits that Lexmark deliberately refused to certify Bertek duplex labels because it feared competition from rival Kyocera (Id.). Again, Bertek refers to the Mellinger email, which

15

Bertek submits is evidence of Lexmark's unwillingness to fairly test the Bertek duplex label (<u>Id</u>.).  The contents of this email message, avers Bertek, clearly suggest  Lexmark's interest in protecting its dominant position in the pharmacy printer industry (<u>Id</u>.).  In order to thwart Kyocera's entrance into the market utilizing Bertek duplex labels, Bertek claims that Lexmark denied certification to Bertek's duplex labels (<u>Id</u>.).

Lexmark submits that Barnes had no intention of interfering with any business relationship which Bertek may have had (<u>Id</u>.).  Whether Bertek was satisfied with Barnes' testing is irrelevant, states Lexmark (<u>Id</u>.).  What is relevant, it contends, is whether Barnes acted with malice (<u>Id</u>.).  As noted above, Lexmark avers that no such evidence exists (<u>Id</u>.).

Also, under Ohio law, a defendant's behavior may be privileged/proper and thus a claim for tortious interference with a business relationship would not stand.  The factors a court should consider when determining whether a defendant was privileged (or his conduct proper) include:

1.  The nature of the actor's conduct;

2.  The actor's motive;

3.  The interests of the party with whom the actor interfered;

4.  The interests sought to be advanced by the actor;

16

5. The social interest of protecting the freedom of contracting and the interference with such;

6. The proximity or remoteness of the actor's conduct to the interference; and

7. The relations between the parties.

<u>Laurel Valley Oil Co. v. 76 Lubricants Co.</u>, 797 N.E.2d 1033, 1037-38 (Ohio Ct. App. 2003); <u>Sancap Abrasives Corp. v. Swiss Indus. Abrasives Group</u>, 68 F. Supp. 2d 853, 861 (N.D. Ohio 1999). Lexmark notes that the most important factor in this analysis is "the nature of the actor's conduct." <u>Id</u>. Lexmark further notes that "coercive" conduct is what courts find particularly troublesome. <u>Id</u>. Lexmark argues that it did not engage in coercive conduct (doc. 23). Lexmark highlights that Walgreens testified that no one from Lexmark ever suggested that Walgreens discontinue its business relationship with Bertek nor did Lexmark put any pressure on Walgreens to sever its ties with Bertek (<u>Id</u>.).

The second factor, avers Lexmark, also weighs in its favor (<u>Id</u>.). As to motive, Lexmark claims it is undisputed that it conducts converter testing as a service to its customers (<u>Id</u>.). Walgreens asked Lexmark to test the Bertek duplex labels (<u>Id</u>.). No evidence exists that Lexmark intended to harm Bertek (<u>Id</u>.). Lexmark contends that its motive was solely to satisfy the request of one of its larger customers, Walgreens (<u>Id</u>.).

"The third and fourth factors involve the relative interests of the plaintiff and defendant implicated by the alleged interference." <u>Sancap</u> at 861. Bertek clearly desired entry onto the Duplex Converter List. Lexmark notes, however, that Bertek had no vested right to be on that list nor was Lexmark under an obligation to test a particular converter's labels (doc. 23). Furthermore, Lexmark states that it had an interest in maintaining the integrity of the testing as its credibility could be adversely affected were it to admit labels onto the Duplex Converter List which were incompatible with its printers (<u>Id</u>.). Yet, placing trouble-free labels on the list would, according to Lexmark, reflect positively on Lexmark and; therefore, it would be in Lexmark's interest to include, rather than exclude, any label that met the testing standards (<u>Id</u>.). Accordingly, Lexmark avers that the third and fourth factors likewise weigh in its favor (<u>Id</u>.).

Lexmark maintains that the fifth and sixth factors also militate in its favor (<u>Id</u>.). However, Lexmark contends that the fifth factor, the social interest involved in contracting, is of little significance to the matter at issue (<u>Id</u>.) As to the proximity or remoteness of the actor's conduct to the interference, Lexmark submits that Barnes is the actor and he was merely in his lab testing labels with no knowledge as to the terms or conditions of the Bertek/Walgreens' contract (<u>Id</u>.). Lexmark argues that it

18

had nothing to do with the condition of the Bertek label which Walgreens ultimately found unacceptable (Id.).

Finally, the last factor, submits Lexmark, also weighs in its favor (Id.). Lexmark maintained a relationship with Walgreens and Bertek (Id.). Lexmark had previously tested and placed Bertek's simplex label on the Converter List (Id.). Presumably Lexmark and Bertek had an amenable relationship prior to the events giving rise to this litigation (Id.). As such, Lexmark concludes that nothing about the relations between the parties in any way supports a claim for tortious interference (Id.). Having established that each factor weighs in its favor, Lexmark reasons that summary judgment should be granted on Bertek's claim of tortious interference with a business relationship (Id.).

Bertek agrees that the seven above listed factors are appropriate in determining whether Lexmark's conduct was privileged/proper (doc. 26). Yet, Bertek maintains that the evidentiary record, contrary to Lexmark's assertion, weighs in its favor as to these seven factors (Id.). First, Bertek avers that a company with Lexmark's monopolistic characteristics who implements a certification process to advance its monopoly is inherently coercive (Id.). Bertek admits that Walgreens was not pressured or intimidated by Lexmark to discontinuing using Bertek's labels (Id.). However, Bertek claims that a label's absence from the

19

converter list is essentially that label's death in the pharmacy arena (Id.).

As to Lexmark's motive, Bertek again points to the email from Mellinger as proof of Lexmark's nefarious motive (Id.). The third and fourth factors - involving the relative interests of Bertek and Lexmark - Bertek submits weigh in its favor (Id.). Bertek argues that although Lexmark contends its interest was simply to provide a service to its customers, the email tells a different story - a story of Lexmark attempting to protect its dominant position in the retail pharmacy market (Id.).

Bertek avers that the fifth factor, the social interests involved, likewise militates in its favor (Id.). Bertek denounces Lexmark's alleged monopolistic behavior, noting that courts tend to look with disfavor on companies who display such behavior (Id. citing Berkey Photo Inc. v. Eastman Kodak Co., 603 F.2d 263, 273 (2d Cir. 1979) (stating that monopolistic behavior "tends to damage the very fabric of our economy and our society")). Again, Bertek emphasizes that Lexmark's Converter Lists determine who can "play" in the retail pharmacy label market (doc. 26). Free and open market competition, submits Bertek, is of paramount social importance and Lexmark's behavior derogates a free and open market environment (Id.).

As to the sixth and seventh factors, Bertek argues that

Lexmark's conduct of implementing the Converter List testing process and denying certain converters certification is "very close in proximity to the tortious interference alleged" (Id.). Furthermore, Bertek submits that close relationships exist between all parties involved in this industry - Lexmark, the converters, and the retail pharmacy chains such as Walgreens (Id.). Thus, asserts Bertek, these two factors weigh in its favor (Id.). As such, Bertek concludes that genuine issues of material fact regarding whether Lexmark's conduct was privileged exist in this case and Bertek urges the Court to deny Lexmark's Motion for Summary Judgment (Id.).

In response to Bertek's counter arguments, Lexmark states that Bertek attempts to avoid summary judgment by purporting to identify issues of material fact, not by disputing the law as announced by Lexmark (doc. 27). However, Lexmark argues that Bertek fails to address the undisputed material facts which mandate summary judgment (doc. 27). Lexmark contends that at the heart of this matter are two undisputed material facts which can lead this Court to only one conclusion - i.e., Summary Judgment in Lexmark's favor (Id.). These two material, undisputed facts, according to Lexmark are: (1) that Bertek's labels did not work in Lexmark's printers and (2) that Lexmark did not act maliciously as a result of the alleged Kyocera threat (Id.).

21

First, Lexmark highlights that Bertek's duplex labels simply did not work in Lexmark printers (Id.). Walgreens tested the Bertek duplex label extensively over the course of one year and ultimately found the label performed unsatisfactorily (Id.). Walgreens' dissatisfaction with the duplex label, notes Lexmark, is not disputed by Bertek (Id.). Nor does Bertek dispute that Walgreens did not experience problems after it replaced the Bertek duplex label with another converter's labels (Id.). Lexmark submits that essentially Bertek's complaint is that Lexmark did not include its duplex label on the Duplex Converter List because it did not work in Lexmark printers (Id.). There is nothing improper, avers Lexmark, with its declining to include a label on its Duplex Converter List that did not function properly with its printers (Id.).

Second, Lexmark submits that Bertek takes the statement made in the Mellinger email completely out of context (Id.). Lexmark notes that in the Mellinger email, dated August 25, 2004, Mellinger presented two options (Id.). The first option was that Lexmark decline to test Bertek labels any further especially given that Bertek might partner with Kyocera (Id). The second option, conveniently left unmentioned by Bertek, was to provide Bertek with an opportunity to retest using a re-engineered label (Id.). This option involved Bertek demonstrating that the changes it made to

22

its label would increase the chances of the label passing (Id.).
Clearly, asserts Lexmark, this second option envisioned the
ultimate entry of the Bertek duplex label onto the Duplex Converter
List (Id.).  In fact, Lexmark highlights that it continued to test
the Bertek duplex label into the middle of 2004, effectively
rejecting option one contained in the Mellinger email (Id.).  This,
contends Lexmark, clearly establishes a lack of malice on its part
(Id.).

        Lexmark cites Russell v. Teledyne Ohio Steel, 892 F.2d
1044 (6th Cir. 1990) for the proposition that, as a matter of law,
a question of material fact is not created by taking evidence out
of context (doc. 27).  Lexmark also cites Parrillo v. Commercial
Union, 85 F.3d 1245 (7th Cir. 1996), in which the Seventh Circuit
noted that a plaintiff can not present a question of material fact
where he presents "one quotation taken entirely out of context."
Id. at 1250; see also Taylor v. Monsanto, 150 F.3d 806, 810 (7th
Cir. 1997) (a question of material fact is not presented when the
interpretation of a particular letter is "misleadingly
selective.").  Lexmark argues that Bertek takes the statement made
in the Mellinger email out of context (doc. 27).

## B.  Ohio's Deceptive Trade Practices Act

        Pursuant to the Ohio Deceptive Trade Practices Act, Ohio
Rev. Code §§ 4165.01 et seq., "[a] person engages in a deceptive

trade practice when, in the course of the person's business, vocation, or occupation, the person . . . [d]isparages the goods, services, or business of another by false representation of fact." Ohio Rev. Code § 4165.02. Bertek claims that evidence exists showing: (1) that Lexmark routinely denied Bertek certification for new and mysterious reasons; (2) that Bertek was never able to reproduce the results that Lexmark cited as reasons for the duplex label failures; (3) that independent third parties were unable to reproduce Lexmark's conclusions regarding Bertek's duplex labels; (4) that Lexmark changed the testing criteria on multiple occasions after testing Bertek's labels; and (5) most importantly, that the Mellinger email proves that Lexmark acted in bad faith to protect its dominant market share and destroy any possibility that Bertek might team with Kyocera to challenge Lexmark's market dominance (doc. 26). Bertek asserts that if Lexmark's failing of the Bertek labels was an attempt to keep it from teaming up with Kyocera then clearly a violation of the Ohio Deceptive Trade Practices Act occurred (Id.).

        In response to this allegation, Lexmark remarks "[a]fter substantial discovery in this case, the basis for this conclusory assertion is still not entirely clear . . . [n]evertheless, Ohio law attaches a conditional or qualified privilege to statements 'fairly made by a person in . . . the conduct of his own affairs,

24

in matters where his interest is concerned'" (doc. 23 <u>citing</u> <u>Hahn</u> <u>v. Kotten</u>, 331 N.E. 2d 713, 718 (Ohio 1975)).  As already noted, Lexmark avers that Bertek has taken the Mellinger email out of context (doc. 27).  Lexmark notes that it tested the Bertek duplex labels at the request of Walgreens and reported the results of the requested tests back to Walgreens (<u>Id</u>.).  Lexmark highlights that it did not publish the results of the tests (<u>Id</u>.).  Futhermore, Lexmark highlights that its test results involving Bertek's duplex labels were confirmed by the experiences Walgreens had with the duplex labels in the actual course of business (<u>Id</u>.).  Accordingly, Lexmark urges the Court to find that it had a conditional or qualified privilege as enunciated in <u>Hahn</u>.

**CONCLUSION**

The Court agrees with Lexmark that genuine issues of material fact are not in dispute as to both of Bertek's claims.  As to Bertek's claim of tortious interference with a business relationship, the Court need not analyze the issue past the requirement that the defendant acted with malice.  Bertek has not met its burden in demonstrating that a genuine issue of material fact exists concerning malice.  The record is clear that Lexmark initially tested and "certified" Bertek's simplex labels, evidencing a positive business relationship between Lexmark and Bertek.  The record is also clear that Lexmark made numerous

25

attempts, often at its own cost, to test and certify Bertek's duplex labels – even, as noted above, going so far as to expend its own resources refurbishing printers owned by Bertek.  Furthermore, the email relied upon so heavily by Bertek, when read in its entirety and in context, demonstrates Lexmark's continued willingness to work with Bertek.  Finally, no evidence exists that Lexmark contacted Walgreens and attempted to persuade or pressure it into discontinuing relations with Bertek.  This is acknowledged by both Walgreens and Bertek.  All of these factors point to Lexmark's reasonable conduct in attempting to work with Bertek, not its malice towards Bertek.

As to the claim that Lexmark violated the Ohio Deceptive Trade Practices Act, the Court finds Bertek has not presented issues of material fact tending to show Lexmark disparaged its goods, services, or business.  Rather, the record is clear and undisputed that Lexmark performed testing at Walgreens' request and reported the results of that testing exclusively to Walgreens.  The test results were reported objectively by Lexmark in the context of its own affairs and interests.  So, even if remarks were made that disparaged the business of Bertek, those remarks were made with privilege as contemplated in Hahn.

26

For the above reasons, the Court GRANTS Lexmark's Motion for Summary Judgment in its favor (doc. 23).  Therefore, this matter is hereby DISMISSED.


SO ORDERED.


Dated: December 20, 2005          /s/ S. Arthur Spiegel
                                  _____
                                  S. Arthur Spiegel
                                  United States Senior District Judge